

**IT IS HEREBY ADJUDGED and DECREED that the below described is SO ORDERED.**

**Dated: July 12, 2023.**

_____
**CRAIG A. GARGOTTA**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

---

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO.  23-50779-cag |
| ARTESIA SPRINGS, LLC, | § | |
| Debtor | § | CHAPTER 11 PROCEEDING |
| | § | SUBCHAPTER V |

**FINAL ORDER PURSUANT TO 11 U.S.C. §§ 105, 362, 363, 364, AND 507, BANKRUPTCY RULES 2002, 4001, 6004, AND 9014, (I) AUTHORIZING THE DEBTOR TO OBTAIN POSTPETITION FINANCING, (II) GRANTING LIENS AND (III) GRANTING RELATED RELIEF**

Upon the motion (the "Motion") of the Debtor, Artesia Spring, LLC (the "Debtor") in the above-captioned Chapter 11 case (the "Chapter 11 Case"), pursuant to sections 105(a), 361, 362, 363(c), 364(d), 364(e) and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), and Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), seeking, among other things, entry of an order:

i.     Authorizing Debtor to obtain post-petition financing, consisting of a senior secured, multi-draw term loan (the "DIP Loan(s)", and together with all other obligations under the DIP Loan Documents (as defined below), the "DIP Obligations") to be advanced and made available to the

1

Debtor in the aggregate maximum principal amount of $40,000 (the "DIP Facility") from Creek View Holdings, LLC or its assigns (collectively, the "DIP Lender"), consistent with the terms and conditions of the Debtor-in-Possession Revolving Note and Security Agreement, attached hereto as Exhibit 1 (as amended, supplemented or otherwise modified from time to time in accordance with the terms and conditions set forth herein)[1], and together with any other document or instrument executed and/or delivered in connection with the DIP Facility, (the "DIP Loan Documents");

  ii.  Authorizing the Debtor to execute and enter into the DIP Loan Documents and to perform all such other and further acts as may be required in connection with the DIP Loan Documents, including the DIP Obligations, and all instruments, security agreements, assignments, pledges, mortgages, reaffirmations and other documents referred to therein or requested by the DIP Lender to give effect to the terms thereof;

  iii.  Authorizing the Debtor to use proceeds of the DIP Facility as permitted in the DIP Loan Documents and in accordance with this Order and the Interim/Final Orders authorizing use of Cash Collateral;

  iv.  Granting a valid, perfected, first priority security interest in and lien upon 100% of Debtor's right, title and interest in all of Debtor's assets (now owned or acquired hereafter) and the proceeds thereof, save and except for the bankruptcy estate's causes of action available under Chapter 5 of the Bankruptcy Code (collectively, the "DIP Collateral") to secure payment of the amount outstanding and owing under the DIP Loan Documents. However, notwithstanding any provisions of this Final Order, the ad valorem tax liens currently held by Bexar County or any post-petition statutory liens which shall arise post-petition pursuant to Texas law (collectively the "Tax Liens")

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the DIP Loan Agreement.

incident to any real property or tangible personal property shall neither be primed by nor subordinated to any liens granted herein;

v.      Vacating and modifying the automatic stay pursuant to Bankruptcy Code § 362 to the extent necessary to implement and effectuate the terms and provisions of this Order and the DIP Loan Documents; and

vi.      Granting the Debtor such other and further relief as is just and equitable.

The Court having held a hearing on the Motion on July 12th, 2023 (the "<u>Final Hearing</u>"); the Court having considered all objections, if any, to the Motion; and upon the record made (a) by the Motion and the exhibits attached thereto, and after due deliberation and consideration, and good and sufficient cause appearing therefor,

**IT IS HEREBY FOUND AND CONCLUDED THAT:[2]**

a.      On June 20th, 2023 (the "<u>Petition Date</u>"), the Debtor filed its voluntary petition for relief with the Court under Subchapter V of Chapter 11 of the Bankruptcy Code.

b.      This Court has jurisdiction over the Chapter 11 Case and the Motion pursuant to 28 U.S.C. § 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of this case and the Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The Court has authority to enter this Final DIP Order consistent with Article III of the United States Constitution.

c.      Under the circumstances, sufficient and adequate notice of the Motion and entry of a Final DIP Order has been given pursuant to Bankruptcy Code §§ 102(1) and 364(d) and Bankruptcy

---

[2] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. Pursuant to Bankruptcy Rule 7052, to the extent any of the following conclusions of law constitute findings of fact, they are adopted as such. Statements made by the Court from the bench during the Final Hearing shall constitute additional conclusions of law and findings of fact, as appropriate.

Rules 2002 and 4001(c) to all entities entitled thereto such that no other or further notice of the Motion or of the entry of this Final DIP Order need be provided to any entity.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1.      After considering the pleadings, evidence and argument of counsel, the Motion is GRANTED as set forth herein.

2.      Any objections to the Motion or to entry of this Final DIP Order that have not been withdrawn or otherwise resolved are hereby OVERRULED.

3.      The execution and delivery of the DIP Loan Documents by Debtor is authorized and approved.

4.      Debtor is hereby immediately authorized to borrow from the DIP Lender up to the principal amount of $40,000 on the terms and conditions set forth in the DIP Loan Documents and this Final DIP Order and pursuant to the Interim and Final Orders authorizing use of Cash Collateral.

5.      As security for the DIP Obligations, and as provided in the DIP Loan Documents and this Final DIP Order, the DIP Lender, shall have, pursuant to Bankruptcy Code sections 364(d), a valid, perfected security interest in and lien upon the DIP Collateral (together, the "DIP Liens"). The DIP Liens are senior and superior in priority to all other secured and unsecured creditors of the Debtor's estate with respect to the DIP Collateral, subject only to the property taxing authorities' statutory liens.

6.      This Final DIP Order shall be sufficient and conclusive evidence of the priority, perfection and validity of the DIP Liens granted herein, effective as of the date of the June 28th, 2023, Interim DIP Order [Docket #26], without any further action by Debtor or the DIP Lender.

7.      While any portion of the DIP Obligations remains unpaid or any of the DIP Loan Documents remains in effect, the Debtor shall not seek entry of any order approving or authorizing

(under Bankruptcy Code §§ 105 or 364, or otherwise) the granting of any lien or security interest in any of the DIP Collateral in favor of any party other than the DIP Lender.

8.      The DIP Facility shall terminate and the DIP Loans and all other DIP Obligations shall mature and be due and owing, upon DIP Lender's election, on the Maturity Date. Written notice of the occurrence of the Maturity Date shall be given by electronic mail (or other electronic means) to the Notice Parties during this Chapter 11 Case.

9.      The DIP Lender may not repossess, foreclose or seize any DIP Collateral after the Maturity Date without providing notice to the Debtor, counsel for the Debtor, the Office of the United States Trustee, the Subchapter V Trustee, and filing with the Bankruptcy Court, a notice of the occurrence of the Maturity Date. At any time after the tenth business day after the delivery and filing of such notice, unless the Bankruptcy Court extends such deadline, the DIP Lender shall have automatic and immediate relief from the automatic stay with respect to the DIP Collateral (without regard to the passage of time provided for in Fed. R. Bankr. P. 4001(a)(3)) and shall be entitled to exercise any and all rights and remedies available to it under the DIP Loan Documents or applicable law.

10.     The automatic stay imposed by Bankruptcy Code § 362(a) is hereby modified, to the extent necessary, to implement and effectuate the terms and conditions of this Final DIP Order.

11.     The Debtor is authorized to perform all acts and execute and comply with the terms of such other documents, instruments, and agreements in addition to the DIP Loan Documents, as the DIP Lender may reasonably require, as evidence of and for the protection of the DIP Obligations, or which otherwise may be deemed reasonably necessary by the DIP Lender to effectuate the terms and conditions of this Final DIP Order and the DIP Loan Documents.  Debtor and the DIP Lender are

hereby authorized to implement, in accordance with the terms of the DIP Loan Documents, any non-material modifications of the DIP Loan Documents without further order of this Court.

12.     Neither the Debtor nor any representative of the estate (including any successor trustee) will invoke or seek to invoke the surcharge provisions of Bankruptcy Code §506(c), the enhancement of collateral provisions of Bankruptcy Code §552 (including, without limitation, the "equities of the case" exception under Bankruptcy Code §552(b)) or any other legal or equitable doctrine upon the DIP Lender or any of the DIP Collateral for the benefit of any party in interest, including any trustee, any official committee, any other trustee, or any professionals engaged by any of the foregoing.

13.     By executing the DIP Loan Documents or taking any actions pursuant to this Final DIP Order, the DIP Lender shall not: (1) be deemed to be in control of the operations or liquidation of the Debtor or its estate; or (2) be deemed to be acting as a "responsible person" with respect to the operation, management, or liquidation of the Debtor or its estate.

14.     The DIP Lender shall not be subject to the equitable doctrine of marshaling or any other similar doctrine with respect to any of the DIP Collateral.

15.     The DIP Lender shall not be required to file any proof of claim in the Chapter 11 Case for any claim under the DIP Loan Documents, or for any claim allowed herein.

16.     The DIP Lender's failure, at any time or times hereafter, to require strict performance by the Debtor (or by any successor trustee) of any provision of this Order or the DIP Loan Documents shall not waive, affect, or diminish any right of the DIP Lender thereafter to demand strict compliance and performance therewith. No delay on the part of the DIP Lender in the exercise of any right or remedy under this Order, the DIP Loan Documents, the Bankruptcy Code, or applicable nonbankruptcy law shall preclude any other or further exercise of any right or remedy. The DIP

Lender shall not be deemed to have suspended or waived any of its rights or remedies under this Final DIP Order, the DIP Loan Documents, the Bankruptcy Code, or applicable nonbankruptcy law unless such suspension or waiver is in writing, signed by a duly authorized officer of such party, and directed to the Debtor.

17.     Any stay, modification, reversal, or vacation of the Interim or Final DIP Order shall not affect the validity and enforceability of any DIP Obligations of the Debtor to the DIP Lender incurred pursuant to the Interim or Final DIP Order or the validity, priority, or enforceability of any of the DIP Liens granted to the DIP Lender under the Interim or Final DIP Order. Notwithstanding any such stay, modification, reversal, or vacation, all DIP Liens granted under the Interim or Final DIP Order, the DIP Loans made pursuant to the Interim or Final DIP Order in respect of the DIP Loan Agreement, and all DIP Obligations incurred by the Debtor or the Debtor's estate pursuant hereto and pursuant to the terms of the DIP Loan Documents prior to the effective date of any such stay, modification, reversal, or vacation shall be governed in all respects by the original provisions of the Interim or Final DIP Order, and the DIP Lender shall be entitled to all the rights, privileges, and benefits, including, without limitation, the DIP Liens, and priorities granted herein with respect to all such DIP Obligations.

18.     The provisions of this Final DIP Order and any actions taken pursuant hereto shall survive entry of any order which may be entered (a) confirming any plan of reorganization or liquidation in the Chapter 11 Case (and, to the extent not satisfied in full, the DIP Obligations shall not be discharged by the entry of any such order, notwithstanding Bankruptcy Code § 1141(d)); (b) converting the Chapter 11 Case to a Chapter 7 case; or (c) dismissing the Chapter 11 Case.

19.     The provisions of this Final DIP Order shall be binding upon and inure to the benefit of the DIP Lender, the Debtor, and their respective successors and assigns, including any trustee appointed or elected in the Chapter 11 Case, whether under Chapter 11 or Chapter 7.

20.     If there is any inconsistency between the terms of the DIP Loan Documents and the provisions of this Final DIP Order, the provisions of this Final DIP Order shall control to the extent of such inconsistency.

21.     Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9014 of the Bankruptcy Rules or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Final DIP Order shall be valid, take full effect, and be enforceable immediately upon entry hereof; there shall be no stay of execution or effectiveness of this Final DIP Order; and any stay of the effectiveness of this Final DIP Order that might otherwise apply is hereby waived for cause shown.

22.     The Court has and will retain jurisdiction to enforce this Final Order.

**It is so ORDERED.**

# # #

**Submitted by:**
William B. Kingman, SBN 11476200
LAW OFFICES OF WILLIAM B. KINGMAN, P.C.
3511 Broadway
San Antonio, Texas 78209
Telephone: (210) 829-1199
Email: bkingman@kingmanlaw.com
***PROPOSED COUNSEL FOR DEBTOR***

**BALLOON WARNING**

**THIS LOAN IS PAYABLE IN FULL AT MATURITY. YOU MUST REPAY THE ENTIRE PRINCIPAL BALANCE OF THE LOAN AND UNPAID INTEREST THEN DUE. THE HOLDER IS UNDER NO OBLIGATION TO REFINANCE THE LOAN AT THAT TIME. YOU WILL, THEREFORE, BE REQUIRED TO MAKE PAYMENT OUT OF OTHER ASSETS THAT YOU MAY OWN, OR YOU WILL HAVE TO FIND ANOTHER HOLDER, WHICH MAY BE THE LENDER YOU HAVE THIS LOAN WITH, WILLING TO LEND YOU THE MONEY. IF YOU REFINANCE THIS LOAN AT MATURITY, YOU MAY HAVE TO PAY SOME OR ALL OF THE CLOSING COSTS NORMALLY ASSOCIATED WITH A NEW LOAN EVEN IF YOU OBTAIN REFINANCING FROM THE SAME HOLDER.**

**REVOLVING NOTE**

**$40,000.00**                                                                    **June 26, 2023**

Artesia Springs, LLC, a Texas limited liability company ("Borrower") promises to pay to the order of Creek View Holdings, LLC or its successors or assigns (collectively, "Lender") at 3003 Aniol St., San Antonio, TX 78219 (or such other place that Lender may designate in writing) the principal sum of Forty Thousand dollars ($40,000.00) or so much thereof as may be advanced and be outstanding, with interest thereon calculated at the Stated Rate, to be computed on each advance from the date of its disbursement as set forth herein. All matured, unpaid principal and interest shall bear interest from date of maturity until paid at the Default Rate defined in this Note.

      1.      Interest Rate.

      A.      Maximum Rate. The term "Maximum Rate" as used in this Note means, at the particular time in question, the maximum rate of non-usurious interest (taking into account all amounts paid or required to be paid which may be deemed, held, or classified as interest under applicable law) which, under applicable law, may then be charged on this Note. If the maximum rate of non-usurious interest changes after the date of this Note, the Maximum Rate shall automatically be increased or decreased, as the case may be, without notice to Borrower from time to time as of the effective time of each change in the maximum non-usurious rate. For purposes of determining the maximum rate of non-usurious interest on this Note, Lender and Borrower agree that the Indicated Weekly Rate ceiling, as determined in accordance with Sections 303.002, 303.003 and 303.008 of the Texas Finance Code and its successor statutes, as amended, and from time to time in effect, shall be used.

      B.      Stated Rate and Default Rate. Prior to the Maturity Date, interest on the principal balance advanced and outstanding ("Unpaid Principal") shall accrue at the rate (the "Stated Rate") of interest of nine percent (9%) pers annum. Any sums which have not been paid when due, whether principal, interest, costs, attorneys' fees, or any money owing for advances by Lender under this Note or other Loan Documents, and whether such sums have matured by lapse of time or by reason of acceleration under the provisions herein or under the Loan Documents, shall bear interest at a rate equal to the lesser of eighteen percent (18.0%) per annum or the Maximum Rate (the "Default Rate"). Interest accruing at the Default Rate and all other amounts due and owing under this Note and the Loan Documents shall be due and payable upon demand. The rights of Lender under this Section 2 shall in any event be subject to the limitations set forth in Section 7.

      C.      Interest Computation. Interest shall be computed on the basis of a year of 360 days and for the actual number of days elapsed (including the first day but excluding the last day). Interest shall

**EXHIBIT 1**

be calculated on the unpaid principal to the date of each installment paid and the payment shall be credited first to accrued but unpaid interest.

2.      Borrowing and Repayment.

A.      Borrowing.  Borrower may from time to time during the term of this Note borrow, partially or wholly repay its/his/her outstanding borrowings, and re-borrow, subject to all of the limitations, terms and conditions of this Note and/or the Loan Documents; provided however, that the total outstanding borrowings under this Note shall not at any time exceed the principal amount stated above. The unpaid principal balance of this obligation at any time shall be the difference of: (i) the total amount advanced from time to time hereunder and (ii) any principal payments made by or for Borrower.  Such balance may be endorsed hereon from time to time by the Lender and shall be affirmed by Borrower upon Lender's request.

B.      Repayment. This Note is due and payable as follows:

Scheduled Payments.  Borrower shall pay accrued interest on all outstanding borrowed amounts on the last day of each month of the term of this note.  If the last day of a month occurs on a Saturday, Sunday or federal holiday, the payment will be due the following business day.  All accrued and unpaid principal and interest is due and payable in full on the earlier of:

(i) June 26th, 2024; or

(ii) an Event of Default occurs and such default is not timely cured and/or if, as described below, the term of this note is accelerated as a result of Borrower's default

(the "Maturity Date"). In order to satisfy the indebtedness under the terms of this Note Borrower shall, on the Maturity Date, pay Lender all outstanding indebtedness due and owing under this Note and/or any court order approving the terms of this Note.

3.      Default.  In the event that (i) the Borrower fails to timely pay the amounts payable hereunder and due and owing to Lender by Borrower or (ii) the Borrower fails to perform in any material respect any of its obligations pursuant to this Note (the foregoing being referred to herein, individually, as an "Event of Default" and, collectively, as "Events of Default"), then, unless such Event of Default violation or breach, is cured within ten (10) days of such default, all of the indebtedness described in this Note and then outstanding shall become immediately due and payable to Lender.

4.      Collection Costs and Late Fees.  If Lender declares an Event of Default by Borrower or any guarantor of any obligations to Lender and/or declares that the entire unpaid amount of this Note at once due payable, then Borrower shall pay to Lender all collections costs incurred in connection with such default and collection, including, but not limited to attorneys' fees and other expenses.

5.      Waivers. The undersigned, all endorsers, all guarantors and all other persons liable or to become liable on this Note, expressly waive demand for payment, presentation for payment, notice of intention to accelerate maturity, notice of acceleration, protest, and notice of protest as to this Note and as to each installment due on this Note. The acceptance by Lender, at any time and from time to time, of part payment of this Note shall not be deemed to be a waiver of any default then existing. No waiver by Lender of any default shall be deemed to be a waiver of any other then existing or subsequent default, nor shall any such waiver by Lender be deemed to be a continuing waiver. No delay or omission by Lender in exercising any right, power, or option granted to Lender in this Note shall impair any such right, power, or option or be construed as a waiver of it or an acquiescence to it, nor shall any single or partial exercise of any such right, power, or option preclude other or further exercise of it or the exercise of any other right, power, or option of Lender under the terms of this Note.

2

6. Usury Savings Clause. It is the intention of Lender and Borrower to conform strictly with applicable usury laws now in force. No provision of this Note or any other document executed in connection with, as evidence of, or as security (or assignment) for the indebtedness evidenced by this Note shall require the payment or permit the collection of interest in excess of the maximum amount permitted by applicable law. If at any time the interest received or contracted for exceeds the maximum lawful rate, Lender shall refund the amount of the excess or shall credit the amount of the excess against amounts owing under the loan and such excess shall not be considered the payment of interest. Determination of the rate of interest shall be made by amortizing, prorating, allocating, and spreading in equal parts during the full contracted period of the life of the loan all interest at any time contracted for, charged, or received from Borrower in connection with the loan.

7. Governing Law. This Note shall be governed by and construed under the applicable laws of the State of Texas.

8. Notices. All notices provided for or permitted to be given pursuant to this instrument must be in writing or may be given or served by depositing the same in the United States mail, addressed to the person to be notified, postage prepaid, and registered or certified with return receipt requested, or by federal express, or other overnight delivery, or by facsimile machine, or by delivering such notice by courier or by hand to such person. Except as otherwise provided in this instrument, notices are effective on the earlier to occur of (i) receipt by the party to be notified or (ii) three days after deposit in the mail in accordance with this paragraph. For purposes of this instrument, Borrower's address is 8130 Interchange Parkway, San Antonio, TX 78218 and Lender's address is 3003 Aniol St., San Antonio, TX 78219.

9. Miscellaneous. All amounts payable under this Note are payable in lawful money of the United States which shall be legal tender for payment of all debts and dues, public and private, at the time of such payment. Borrower agrees to perform and comply with the covenants, conditions, provisions, and agreements contained in this Note and in every other instrument evidencing or securing payment of the indebtedness evidenced by this Note.

10. Line of Credit. This Note evidences a straight line of credit. Once the total amount of principal has been advanced, Borrower is not entitled to further loan advances. Advances under this Note, as well as directions for payment from Borrower's accounts, may be requested orally or in writing by any authorized officer of Borrower, acting alone, who is authorized to request advances and direct the disposition of any advances and as to which the holder has received evidence of incumbency and such authorization, until written notice of revocation of such authority is received by the Lender at the office designated above. Lender may, but need not, require that all oral requests be confirmed in writing. Borrower agrees to be liable for all sums either: (a) advanced in accordance with the instructions of an authorized person or (b) credited to any of Borrower's accounts with Lender. The unpaid principal balance owing on this Note at any time may be evidenced by endorsements on this Note or by Lender's internal records, including daily computer print-outs. Lender will have no obligation to advance funds under this Note if: (a) Borrower or any guarantor is in default under the terms of this Note or any agreement that Borrower or any guarantor has with Lender, including any agreement made In connection with the signing of this Note; (b) Borrower or any guarantor ceases doing business or is insolvent; (c) Borrower has applied funds provided pursuant to this Note for a purpose other than those authorized by Lender; or (d) Lender In good faith believes herself insecure.

It is contemplated that there will be advances and payments on this Note from time to time, but advances or payments on this Note (including the payment of the total unpaid balance of the principal prior to maturity) shall not affect or impair the validity or enforceability of this Note as to any future advances hereunder or as to any security (or assignment) given to ensure payment of this indebtedness.

11. Successors and Assigns. The terms and conditions hereof shall inure to the benefit of and be binding upon the successors and assigns of the parties hereto.

12.     Attorney's Fees.  Borrower promises to pay attorney's fees and costs in the amount of $600.00 for preparation of this Promissory Note and related documents.  Borrower also promises to pay reasonable attorney's fees and court and other costs if this note is placed in the hands of an attorney to collect or enforce the note or if Lender takes collection action without an attorney.  These expenses will bear interest from the date of advance at the Annual Interest Rate on Matured, Unpaid Amounts.  Borrower will pay Lender these expenses and interest on demand at the Place for Payment.  These expenses and interest will become part of the debt evidenced by the note and will be secured by any security (or assignment) for payment.

13.     Balloon Feature.

**THE LOAN EVIDENCED BY THIS NOTE IS PAYABLE IN FULL ON THE MATURITY DATE.  YOU MUST REPAY THE ENTIRE PRINCIPAL BALANCE OF THE LOAN, UNPAID INTEREST AND ALL OTHER AMOUNTS THEN DUE.  THE LENDER IS UNDER NO OBLIGATION TO REFINANCE THE LOAN AT THAT TIME.  YOU WILL THEREFORE BE REQUIRED TO MAKE PAYMENT OUT OF OTHER ASSETS YOU MAY OWN, OR YOU WILL HAVE TO FIND A LENDER WILLING TO LEND YOU THE MONEY AT PREVAILING MARKET RATES, WHICH MAY BE CONSIDERABLY HIGHER OR LOWER THAN THE INTEREST RATE ON THIS LOAN.  IF YOU REFINANCE THIS LOAN AT MATURITY, YOU MAY HAVE TO PAY SOME OR ALL CLOSING COSTS NORMALLY ASSOCIATED WITH A NEW LOAN, EVEN IF YOU OBTAIN REFINANCING FROM THE LENDER.**

Effective as of June _____, 2023

BORROWER:

Artesia Springs, LLC

By:_____
      Rodolfo Ramon, CEO

## SECURITY AGREEMENT

This Security Agreement (as amended, modified, or restated from time to time, this "<u>Agreement</u>"), effective for all purposes as of June __, 2023 (the "<u>Effective Date</u>"), is by and between Artesia Springs, LLC a Texas limited liability company ("<u>Debtor</u>") and Creek View Holdings, LLC (together with its successors and assigns, "<u>Lender</u>").

### R E C I T A L S:

A.      Lender and Debtor have agreed that Debtor will pay Lender the principal sum of up to $40,000.00 pursuant to the terms and conditions of a Revolving Note, dated as of the Effective Date (the "<u>Agreement</u>").

B.      As a condition to Lender agreeing to the terms in the Agreement, Lender requires that Debtor grant Lender a security interest in all of Debtor's assets including, but not limited to, all of Debtor's assets, whether now owned or acquired hereafter, including those assets described in Exhibit "A" (the "Collateral") as security for Debtor's payment and performance of the obligations under the Agreement (as defined below).

C.      Debtor has agreed to enter into this Agreement, pursuant to which Debtor shall grant Lender a security interest in the Collateral.

### A G R E E M E N T:

Now, therefore, in consideration of the premises and in order to induce Lender to advance funds under the Note, and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged, Debtor agrees and covenants with Lender as follows:

1.      **<u>Definitions</u>**.    All capitalized terms used but not defined in this Agreement have the respective meanings given to such terms in the Agreement.  Notwithstanding the foregoing sentence, terms used in Article 9 of the Uniform Commercial Code (the "<u>Code</u>") in the State of Texas, when used in this Agreement, have the definitions given to such terms in the Code.

2.      **<u>Grant of Security</u>**.    Debtor assigns, pledges and grants to Lender for its benefit, a continuing security interest in all of Debtor's right, title and interest in and to the Collateral and all of Debtor's interest in the proceeds of any collection, sale or disposition of any of the foregoing.

3.      **<u>Security for Obligations</u>**.  This Agreement and the security interest created hereby secures the prompt and complete payment, observance and performance of all duties, liabilities, obligations of Debtor arising under the Agreement and all renewals, extensions and modifications of the obligations referred to in the Agreement, or any part thereof.

4.      <u>R**epresentations and Warranties**</u>.  Debtor represents and warrants as follows:

(a)      Debtor owns the Collateral free and clear of any lien, security interest, charge or encumbrance of any kind whatsoever (collectively, "<u>Liens</u>") except for the

security interest created hereby in favor of Lender and Liens approved by Lender pursuant to a written consent or agreement executed by Lender or otherwise identified in or permitted by the Note or this Agreement ("Permitted Liens").

(b)     This Agreement creates a valid and perfected security interest in the Collateral, securing the payment of the Obligations, and all filings and other actions of Debtor necessary or desirable to perfect and protect such security interest have been, or will be upon Lender's request, duly taken by Debtor.

(c)     No authorization, approval or other action by, and no notice to or other filing with, any governmental authority or regulatory body is required, either (i) for the grant by Debtor of the security interest granted by this Agreement or for the execution, delivery or performance of this Agreement by Debtor, or (ii) for the perfection of or the exercise by Lender of its rights and remedies hereunder (other than the filing of Financing Statements by Lender).

(d)     Debtor's principal place of business is 8130 Interchange Parkway, San Antonio, TX 78218. Debtor's books and records are located at its principal place of business.

6.     **Covenants and Further Assurances**.

(a)     Debtor agrees that, until July 31st, 2023, Debtor shall promptly execute and deliver all further instruments and documents, and shall take all further action, that may be reasonably necessary or desirable, or that Lender may request, in order to perfect and protect any security interest granted or purported to be granted hereby or to enable Lender to exercise and enforce rights and remedies hereunder with respect to any Collateral.

(b)     Debtor authorizes Lender to file one or more Financing Statements relative to all or any part of the Collateral without the signature of Debtor where permitted by law. A carbon, photographic or other reproduction of this Agreement or any Financing Statement covering the Collateral or any part thereof shall be sufficient as a financing statement where permitted by law. Debtor acknowledges and agrees that any Financing Statement filed by or on behalf of Lender against Debtor, whether such filing is or was made prior to or after the date of this Agreement, is deemed to include the security interest granted by this Agreement, regardless of whether such Financing Statement is or was filed in connection with the Note or some other indebtedness owed to Lender.

8.     **Transfers and Other Liens**.  Debtor shall not:

(a)     sell, assign (by operation of law or otherwise) or otherwise dispose of any of the Collateral, other than in the ordinary course of business; or

(b)    create or suffer to exist any Lien upon or with respect to any of the Collateral to secure debt of any person, except for the security interest created by this Agreement and any permitted liens.

10.    **Rights Prior to Default; Termination**.

(a)    <u>Rights Prior to Default</u>. So long as no Default shall have occurred and be continuing, Debtor shall be entitled to exercise any and all rights and powers relating or pertaining to the Collateral, including, for any purpose not inconsistent with the terms of this Agreement.

(b)    <u>Termination of Rights</u>. Debtor understands that during any period when a Default shall have occurred and be continuing, and after Lender has given written notice to Debtor that Lender has exercised its rights under this <u>Section 10(b)</u>, all rights of Debtor to exercise its power with respect to the Collateral, which Debtor was previously entitled to exercise pursuant to <u>Section 10(a)</u> shall cease and all such rights shall become vested in Lender, which shall have the sole and exclusive right and authority to exercise such power. All amounts, if any, representing principal prepayment or payoffs and all amounts, if any, collected by Debtor after the occurrence of any Default represents trust funds which are assigned and belong to Lender and which are to be immediately delivered to Lender, and any retention of such funds by Debtor before and after the occurrence of a Default shall be deemed to be a conversion of Lender's property, *ipso facto*. The obligor making any payment to Lender under this Agreement shall be fully protected in relying on the written statement of Lender that it then holds a security interest which entitles Lender to receive such payments. Any and all money and other property paid over to or received by Lender pursuant to the provisions of this <u>Section 10(b)</u> shall be retained by Lender as additional Collateral under this Agreement.

11.    **Lender May Perform**.  If Debtor fails to perform any covenant or agreement contained in this Agreement, Lender may itself perform, or cause performance of, such covenant or agreement, and the expenses of Lender incurred in connection therewith shall be payable by Debtor upon demand.

12.    **Lender's Duties**.  The powers conferred on Lender under this Agreement are solely to protect its interest in the Collateral and shall not impose any duty upon it to exercise any such powers.  Except for the safe custody of any Collateral in its possession and the accounting for moneys actually received by it hereunder, Lender shall have no duty as to any Collateral or as to the taking of any necessary steps to preserve rights against prior parties or any other rights pertaining to any Collateral.

13.    **Events of Default**.  Each of the following events constitutes a Default (so called) under this Agreement:

(a)    any Event of Default occurs under the Agreement;

(b)     any material breach of any provision of this Agreement that is not cured within ten (10) days' notice thereof.

14.     **Remedies**.  If any Default shall occur and be continuing, Lender may protect and enforce its rights under this Agreement and the Note by any appropriate proceedings, including proceedings for specific performance of any covenant or agreement contained in this Agreement and the Note and Lender may enforce the payment of any Obligations due it or enforce any other legal or equitable right which it may have.  All rights, remedies and powers conferred upon Lender under this Agreement and the Note shall be deemed cumulative and not exclusive of any other rights, remedies or powers available under this Agreement and the Note or at law or in equity. Lender's authority and rights shall include, without limitation, the following:

(a)     Lender may exercise in respect of the Collateral, in addition to other rights and remedies provided for in this Agreement or otherwise available to it, all the rights and remedies of a secured party on default under the Code (whether or not the Code applies to the affected Collateral) and also may (i) require Debtor to, and Debtor agrees that it will at its expense and upon request of Lender forthwith, assemble all or part of the Collateral as directed by Lender and make it available to Lender at a place to be designated by Lender which is reasonably convenient to it, and (ii) without notice except as specified below, sell the Collateral or any part thereof in one or more parcels at public or private sale, at any of Lender's offices or elsewhere, for cash, on credit or for future delivery, and upon such other terms as Lender may deem commercially reasonable.  Debtor agrees that, to the extent notice of sale shall be required by law, at least ten (10) business days' notice to Debtor of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification.  Lender shall not be obligated to make any sale of Collateral regardless of notice of sale having been given.  Lender may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned.

(b)     All cash proceeds received by Lender in respect of any sale of, collection from, or other realization upon all or any part of the Collateral may, in the discretion of Lender, be held by Lender as Collateral for, and/or then or at any time thereafter applied in whole or in part by Lender against all or any part of the Obligations in such order as Lender shall elect, subject to any mandatory provisions of this Agreement or applicable law.  Any surplus of such cash or cash proceeds held by Lender and remaining after payment in full of all the Obligations shall be paid over to Debtor or to whomsoever may be lawfully entitled to receive such surplus.

15.     **Indemnity and Expenses**.

(a)     Debtor, jointly and severally, agrees to indemnify Lender from and against any and all claims, losses and liabilities growing out of or resulting from this Agreement (including, without limitation, enforcement of this Agreement), except claims, losses or liabilities resulting from Lender's gross negligence or willful misconduct.

(b)    Debtor will upon demand pay to Lender the amount of any and all reasonable expenses, including the reasonable fees and disbursements of its counsel and of any experts and agents, which Lender may incur in connection with (i) the administration of this Agreement, (ii) the custody, preservation of, use or operation of, or the sale of, collection from, or other realization upon, any of the Collateral, (iii) the exercise or enforcement of any of the rights of Lender hereunder, or (iv) the failure by Debtor to perform or observe any of the provisions hereof.

17.    **Security Interest Absolute**.  All rights of Lender and security interests hereunder, and all obligations of Debtor hereunder, shall be absolute and unconditional, irrespective of:

(a)    any lack of validity or enforceability of the Note or any instrument relating thereto;

(b)    any change in the time, manner or place of payment of, or in any other term of, all or any of the Obligations or any other amendment or waiver of or any consent to any departure from the Note;

(c)    any exchange, release or non-perfection of any other Collateral, or any release or amendment or waiver of or consent to departure from any guaranty, for all or any of the Obligations; or

(d)    any other circumstance which might otherwise constitute a defense available to, or a discharge of, Debtor, or a third party holder of a security interest.

18.    **Notice**.  All notices and other communications under this Agreement will be in writing and will be mailed by registered or certified mail, postage prepaid, sent by facsimile, delivered personally by hand, or delivered by nationally recognized overnight delivery service addressed to Lender at the address provided in the Note, or, with respect to Debtor, addressed to Debtor at the address set forth for Debtor on the signature page to this Agreement, or to such other address as a party may have delivered to the other parties for purposes of notice.  Each notice or other communication will be treated as effective and as having been given and received (a) if sent by mail, at the earlier of its receipt or three business days after such notice or other communication has been deposited in a regularly maintained receptacle for deposit of United States mail, (b) if sent by facsimile, upon confirmation of facsimile transfer, (c) if delivered personally by hand, upon written confirmation of delivery from the person delivering such notice or other communication, or (d) if sent by nationally recognized overnight delivery service, upon written confirmation of delivery from such service.

19.    **Continuing Security Interest**.  This Agreement shall create a continuing security interest in the Collateral.  Upon the payment in full of the Obligations, the security interest granted hereby shall terminate.  Upon any such termination, Lender will, at Debtor's expense, execute and deliver to Debtor such documents as Debtor shall reasonably request to evidence such termination.

20.    **Mutual Understanding**.  Debtor represents and warrants to Lender that Debtor has read and fully understands the terms and provisions hereof, has had an opportunity to review this

Agreement with legal counsel and has executed this Agreement based on Debtor's own judgment and advice of counsel. If an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the parties and no presumption or burden of proof will arise favoring or disfavoring any party because of authorship of any provision of this Agreement.

21. **Further Assurances**. Debtor will, until July 31st 2023, promptly execute and deliver to Lender on Lender's request, all such other and further documents, agreements and instruments, and shall deliver all such supplementary information, in compliance with or accomplishment of the agreements of Debtor under this Agreement and the Note.

22. **Cumulative Remedies**. Debtor agrees that all rights and remedies that Lender is afforded by reason of this Agreement are separate and cumulative with respect to Debtor and otherwise and may be pursued separately, successively, or concurrently, as Lender deems advisable. In addition, all such rights and remedies of Lender are non-exclusive and shall in no way limit or prejudice Lender's ability to pursue any other legal or equitable rights or remedies that may be available to Lender.

23. **Enforcement and Waiver by Lender**. Lender shall have the right at all times to enforce the provisions of this Agreement and the Note in strict accordance with their respective terms, notwithstanding any conduct or custom on the part of Lender in refraining from so doing at any time or times. The failure of Lender at any time or times to enforce its rights under such provisions, strictly in accordance with the same, shall not be construed as having created a custom or in any way or manner modified or waived the same. All rights and remedies of Lender are cumulative and concurrent and the exercise of one right or remedy shall not be deemed a waiver or release of any other right or remedy.

24. **CHOICE OF LAW; JURISDICTION. EXCEPT TO THE EXTENT THAT THE VALIDITY OR PERFECTION OF SECURITY INTERESTS OR REMEDIES IN RESPECT OF ANY PARTICULAR COLLATERAL IS GOVERNED BY THE LAWS OF A JURISDICTION OTHER THAN THE STATE OF TEXAS, THIS AGREEMENT AND THE NOTE SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE SUBSTANTIVE LAWS OF THE STATE OF TEXAS, WITHOUT REGARD TO ITS CONFLICTS OF LAWS PROVISIONS. JURISDICTION FOR ALL MATTERS ARISING OUT OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS SHALL BE EXCLUSIVELY IN THE STATE AND FEDERAL COURTS SITTING IN DALLAS COUNTY, TEXAS, AND DEBTOR IRREVOCABLY SUBMITS ITSELF TO THE JURISDICTION OF SUCH STATE AND FEDERAL COURTS AND AGREES AND CONSENTS NOT TO ASSERT IN ANY PROCEEDING, THAT ANY SUCH PROCESS IS BROUGHT IN AN INCONVENIENT FORUM OR THAT THE VENUE THEREOF IS IMPROPER, AND FURTHER AGREES TO A TRANSFER OF SUCH PROCEEDING TO THE COURTS SITTING IN DALLAS COUNTY, TEXAS.**

25. **Severability**. If any provision of this Agreement or the Note shall be held invalid under any applicable laws, then all other terms and provisions of this Agreement and the Note shall nevertheless remain effective and shall be enforced to the fullest extent permitted by applicable law.

26.     **Amendments; Waivers**.  No amendment or waiver of any provision of this Agreement nor consent to any departure by Debtor therefrom, shall in any event be effective unless the same shall be in writing and signed by Lender and the affected Debtor, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.  Debtor may not be released from Debtor's obligations hereunder, except pursuant to a written instrument executed by Lender.

27.     **Binding Effect; Assignment**. This Agreement shall be binding on Debtor and Debtor's legal representatives, successors, and assigns, including, without limitation, any receiver, trustee or debtor in possession of or for Debtor, and shall inure to the benefit of Lender and its successors and assigns.  Debtor shall not be entitled to transfer or assign this Agreement in whole or in part without the prior written consent of Lender. This Agreement is freely assignable and transferable by Lender without the consent of Debtor.  Should the status, composition, structure or name of Debtor change, this Agreement shall continue and also cover Debtor under the new status composition, structure or name according to the terms of this Agreement.

28.     **Counterparts**. This Agreement may be executed in any number of multiple counterparts, all of which when taken together shall constitute but one and the same instrument.

29.     **Captions**.  The captions in this Agreement are for the convenience of reference only and shall not limit or otherwise affect any of the terms or provisions hereof.

30.     **Number or Gender of Words**.  Except where the context indicates otherwise, words in the singular number will include the plural and words in the masculine gender will include the feminine and neutral, and vice versa, when they should so apply.

**31.     ENTIRE AGREEMENT.   THIS AGREEMENT AND THE NOTE TOGETHER CONSTITUTE THE ENTIRE AGREEMENT AMONG THE PARTIES CONCERNING THE SUBJECT MATTER HEREOF, AND ALL PRIOR DISCUSSIONS, AGREEMENTS AND STATEMENTS, WHETHER ORAL OR WRITTEN, ARE MERGED INTO THIS AGREEMENT AND THE NOTE.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS AMONG THE PARTIES AND THIS AGREEMENT AND THE NOTE MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.**

32.     Arbitration; Governing Law. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas. Any dispute arising from this Agreement shall be settled by arbitration in accordance with the commercial rules then in effect of the American Arbitration Association, except as modified in this Section 32 and, except that the arbitrator(s) shall be selected in accordance with the following procedure: such dispute shall be referred to and decided by a single arbitrator if the parties can agree upon one within thirty (30) days after either of the parties shall notify the other that it wishes to avail itself of the provisions of this Section 33; otherwise, such dispute shall be referred to and decided by three arbitrators, one to be appointed by Borrower and one to be appointed by the Lender, each such appointment to be made within twenty (20) days after the expiration of the thirty (30) day period referred to above, and the third

arbitrator to be appointed by the first two arbitrators within thirty (30) days after the expiration of such twenty (20) day period. If the first two arbitrators cannot reach agreement on the third arbitrator within said thirty (30) day period, the third arbitrator shall be an impartial arbitrator appointed by the President of the American Arbitration Association within twenty (20) days after the expiration of said thirty (30) day period. Hearings of the arbitrator(s) shall be held in Dallas, Texas, unless the parties agree otherwise. The presentations of the parties in the arbitration proceeding shall be commenced and completed within sixty (60) days after selection of the arbitration panel, and the arbitration panel shall render its decision in writing within thirty (30) days after completion of such presentations. Any decision concurred in by any two (2) of the arbitrators shall constitute the decision of the arbitration panel, and unanimity shall not be required. Judgment upon an award rendered by the arbitrator(s) may be entered in any court of competent jurisdiction, including courts in the State of Texas. Any award so rendered shall be final and binding upon the parties hereto. All costs and expenses of the arbitrator(s) shall be paid by the non-prevailing party, and all costs and expenses of experts, witnesses and other persons retained by the parties shall be borne by the non-prevailing party.

This Agreement has been executed on this the _____ day of _____, 2023, but it is effective for all purposes as of the Effective Date.

**DEBTOR**:

Artesia Springs, LLC
a Texas limited liability company

By:_____
    Rodolfo Ramon, CEO


**AGREED AND ACKNOWLEDGED:**

**LENDER**:

Creek View Holdings, LLC



By:_____
    Biren Patel

By:_____
    Dev Kash

## EXHIBIT A - COLLATERAL

## THE COLLATERAL

The security interest is granted in all of the Debtor's personal property, whether now owned or acquired hereafter, including, but not limited to, the following (the "Collateral"):

(a)     all equipment, vehicles, machinery, trade fixtures, furniture, and all other personal property owned by the Debtor (the "Personalty") now or hereafter used for the purposes for which they were or are to be used, attached, placed, erected, constructed or developed, or  which Personalty is or may be used in or related to the planning, development, financing or operation of the Debtor's business, and all renewals of or replacements or substitutions for any of the foregoing, whether or not the same are or shall be located at the Debtor's business:

(b)     all inventory now owned or hereafter acquired and products and proceeds thereof;

(c)     All accounts, contract rights, and accounts receivable, causes of action, commercial tort claims now or hereafter in existence and all proceeds thereof, and all returned or repossessed goods arising from or relating to any of said accounts or rights;

(d)      All substitutes and replacements for, accessions, attachments, and other additions to, and tools, parts, and equipment used in connection with any of the above;

(e)     All property similar to the above hereafter acquired by Debtor;

(f)     All general intangibles, now owned or hereafter acquired by Debtor;

(h)     All cash, income, profits, rents or non-cash proceeds of any of the foregoing;

(g)     All proceeds arising from or by virtue of the sale, lease or other disposition of the Collateral;

(h)     All proceeds (including premium refunds) of each policy of insurance relating to the Collateral;

(i)     All ledger sheets, files, records, documents, and instruments (including, but not limited to, computer programs, tapes, and related electronic data processing software) evidencing an interest in or relating to the above;

(l)     All other interests of every kind and character that Debtor now has or at any time hereafter acquires in and to the Personalty, all other Collateral described herein and all property that is used or useful in connection therewith.